IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| MELISSA ANNE DANCICO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Civil Action No. 1:24-cv-1317 (RDA/WEF) |
| | ) |
| MLT SYSTEMS LLC, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## **MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant MLT Systems LLC's Motion for Summary Judgment. Dkt. 25. This Court has dispensed with oral argument as it would not aid in the decisional process. *See* Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering the Motion together with Defendant's Memorandum in Support (Dkt. 26), Plaintiff's Opposition Brief (Dkt. 28), and Defendant's Reply Brief (Dkt. 29), this Court GRANTS the Motion for the reasons that follow.

## I. PROCEDURAL BACKGROUND

On July 30, 2024, Plaintiff filed her Complaint. Dkt. 1. On August 28, 2024, Defendant filed its Motion to Dismiss Counts I and II. Dkt. 4. On December 11, 2024, this Court issued a Memorandum Opinion and Order granting in part and denying in part the Motion to Dismiss. Dkt. 17. The Court granted the motion with respect to Count 2, but denied it with respect to Count 1. *Id.* Plaintiff had an opportunity to amend Count 2, but did not do so. *Id.* Thereafter, Defendant filed its Answer, a Scheduling Order issued, and the parties engaged in discovery. Dkts. 18, 19, 21.

1

On May 30, 2025, Defendant filed its Motion for Summary Judgment. Dkt. 25. On June 10, 2025, Plaintiff filed her Opposition. Dkt. 28. On June 16, 2025, Defendant filed its Reply. Dkt. 29.

## II.     UNDISPUTED STATEMENT OF FACTS[1]

Before analyzing the Motion at issue here, the Court must first determine the undisputed summary judgment record, as summary judgment is only appropriate where there are no genuine disputes of material fact. Defendant appropriately set forth its Statement of Undisputed Facts with citations to the record as required by the Local Rules and the Rule 16(b) Scheduling Order. *See* Dkt. 26 at 2-17; Dkt. 21 ¶ 9(f); E.D. Va. L.R. 56(B) (requiring the moving party to list all material facts as to which there is no genuine issue and to cite to portions of the record). Plaintiff, in her Opposition, also in compliance with the Local Rules, responded by documenting, in enumerated paragraphs, the asserted undisputed facts with which she disagreed. Dkt. 28 at 5-23.[2] The Court has reviewed all of the parties' submissions and determined that the following facts are undisputed:

1. Defendant hired Plaintiff, at-will, as its HR Manager effective September 19, 2022, earning an annual salary of $90,000.

2. Plaintiff's supervisor was Jerry Balestreri.

3. In February 2023, Plaintiff received a certification from the Society of Human Resource Management ("SHRM"). In accordance with the parties' negotiations at the time of her hire, Defendant therefore raised Plaintiff's salary and changed her title to Director of HR.

---

[1] With the exception of citations to deposition testimony and where otherwise specifically indicated, all references to page numbers refer to the CM/ECF designated page numbers.

[2] Although Plaintiff generally complied with the Rules, Plaintiff often made it difficult to determine her specific dispute regarding an asserted fact because she would either respond by reciting a large swath of information that appears unrelated to the particular fact she is attempting to dispute or respond by merely incorporating a prior attempt to dispute a fact without reference as to how that prior response applied to the subsequent asserted fact. This complicated the process by which the Court has to ascertain the undisputed facts.

4. This raise and title change were based on Plaintiff's successful receipt of the certification and not based on Plaintiff's performance in the role.[3]

5. At the start of her employment, Balestreri asked Plaintiff to provide a plan and prioritization of tasks for Defendant's HR department. Dkt. 26-3 at 93:5-94:2.[4]

6. Although Plaintiff provided a year-long project plan for the HR department, Balestreri grew concerned that Plaintiff could not complete her plan. In January 2023, only four months into her employment, Balestreri wrote that it seemed to him that "the sky was falling on everything [she did]."[5]

---

[3] Plaintiff attempts to rely on Balestreri's testimony that the change in title and salary was based on "merit" to dispute Defendant's assertion that the changes were *not* based on performance in the role. Although Balestreri did agree that the changes were based on merit, Dkt. 28-13 at 46:9-10, he later clarified that, by merit, he meant that it was based on her obtaining the certification and the changes did not constitute a promotion, Dkt. 26-3 at 98:5-22. Plaintiff also agreed that the change in salary and title was based solely on her obtaining her certification, where she failed to dispute that the changes were "[i]n accordance with the parties' negotiations at the time of her hire." Dkt. 26 at 2 ¶ 3; Dkt. 28 at 5 (failing to dispute the asserted fact). It is also worth noting that, in her own deposition, Plaintiff also agreed that the raise was based on the completion of her SHRM certification. Dkt. 28-14 at 17:14-22. Accordingly, Plaintiff has failed to adequately dispute the asserted fact, namely, that the changes were not based on performance.

[4] Plaintiff attempts to dispute the asserted fact, that she was asked to create a plan and prioritization, in reliance on her own deposition testimony. Dkt. 28 at 5-6 ¶ 5. Plaintiff's deposition testimony first demonstrates that she did not recall a specific meeting, not that she denies such a meeting occurred. Dkt. 28-14 at 40:1-4 (when asked whether she remembers such a meeting, Plaintiff answers "I don't"). More importantly, however, Plaintiff's deposition testimony reflects that there was a plan and an attempt at prioritization, thus the cited deposition testimony supports, rather than contradicts, the asserted fact. *See* Dkt. 28-14 at 40:17-21 ("It was part of my HR plan."); Dkt. 28-14 at 50:22 ("I had a plan, I had a process . . . ."); *see also* Dkt. 26-1 at 31:7-10 (discussing "a year long project plan for the HR program and department"). Accordingly, the cited evidence does not dispute the asserted fact, and there is no genuine dispute of material fact.

[5] Plaintiff attempts to dispute the asserted facts, but it is unclear with which part of the asserted facts Plaintiff disagrees. In the January 2023 emails, Plaintiff communicates that she does not have "the time or due diligence needed to ascertain resources and create the written processes necessary to implement these changes." Dkt. 26-4 at 2. Balestreri could reasonably interpret this as a suggestion that Plaintiff could not complete her plan. The emails continue with Balestreri stating: "If priorities change so be it, but the sky is falling on everything you do." *Id.* at 1. In her deposition, Plaintiff also testified to having a "year long project plan for the HR program and department." Dkt. 26 at 31:7-10. Thus, it is unclear with what portions of the asserted facts Plaintiff disagrees. Moreover, her citations to policies regarding performance evaluations appear unrelated to the asserted fact. Dkt. 28 at 6 ¶ 6. Accordingly, the cited evidence does not dispute the asserted fact, and there is no genuine dispute of material fact.

3

7. In April 2023, Plaintiff emailed Balestreri and Mark Tornai, Defendant's President, CEO, and sole owner, to confirm that her order of tasks is: "People" then "Compliance." In response, Balestreri stated: "I honestly don't get it. There is time for both." Balestreri later added: "Well unless compliance requirements have changed significantly, I don't understand the lift. We have NEVER had a compliance issue . . . This is what I asked you to focus on the first 30 days here. Now we have compliance issues."

8. During this time, Plaintiff would raise perceived compliance issues with Tornai. Yet, every time Tornai would research the compliance issues himself or ask third-party vendors about the issues that she had raised, he would learn that there was no compliance issue.[6]

9. When Defendant hired Plaintiff, she, along with six other managers, reported directly to Balestreri.[7]

10. Effective May 8, 2023, Defendant announced a new corporate structure, in which three vice presidents, rather than seven managers, would report directly to Balestreri.

11. Defendant promoted two of the managers who previously reported to Balestreri to Vice Presidents, and the other five managers, including Plaintiff, began reporting to one of the three new Vice Presidents.

12. Although Plaintiff initially expressed congratulations to Defendant for its growth when she learned of the reorganization, she subsequently disclosed to her new supervisor, Clarissa Tornai-Barrett,[8] that "this change feels somewhat retaliatory and completely unexpected

---

[6] The fact asserted by Defendant is that when Tornai researched himself to determine whether Defendant was out of compliance, as would be indicated by Plaintiff, he would learn that Defendant is actually in compliance. Although Plaintiff attempts to dispute this asserted fact, her response is simply that she was on track to complete compliance reports, which does not dispute that Plaintiff was not accurately making compliance determinations or relate in any way to Defendant's cited testimony. Dkt. 28 at 6 ¶ 8 (asserting that Plaintiff was on track to complete the compliance reports). Accordingly, the cited evidence does not dispute the asserted fact, and there is no genuine dispute of material fact.

[7] Defendant's asserted fact is supported by Plaintiff's deposition testimony and Defendant's Organizational Chart. *See* Dkt. 26-1 at 131:12-19 ("I believe that was the – the structure. Yes."); Dkt. 26-7. Plaintiff asserts that she reported directly to Tornai regarding compliance issues, but the cited portion of Tornai's deposition on which she purports to rely is not included in the excerpts of the deposition that she provided. *Contrast* Dkt. 28 at 6 ¶ 9 (relying on Tornai's deposition at 41:9-21), *with* Dkt. 28-15 (jumping from page 37 to page 42). The other deposition testimony that Plaintiff cites relates to whether Balistreri participated in Plaintiff's interview, the relevance of which is unclear. Accordingly, Plaintiff has failed to demonstrate a genuine dispute of material fact.

[8] Tornai-Barrett is Tornai's daughter and the Vice President of Resource Management, overseeing Human Resources and Recruiting. Dkt. 28 at 6 ¶ 13. Tornai-Barrett has a degree in

following the conversation addressing some personnel concerns with [Tornai]." Plaintiff had a conversation with Tornai to address personnel concerns in early May, when she disclosed to Tornai her perception that Defendant was "pre-selecting" former Marines for roles for which Plaintiff did not believe those former Marines to be the most qualified candidates.

13. In response to Plaintiff's concerns regarding retaliation for her email regarding the former Marines, Tornai-Barrett attempted to reassure Plaintiff that the corporate reorganization had been a topic of discussion for months.

14. On May 30, 2023, Plaintiff emailed Defendant's corporate team to apologize for her attitude and unapproachable demeanor. She also apologized for making anyone feel uncomfortable or disrespected.

15. That same day, Vice President of Customer Solutions Zoe Zerbe,[9] who had covered the office the prior week, prepared a memorandum to file, memorializing that Plaintiff had also apologized in person for her words or actions over the past few months that may have been offensive to Zerbe. Zerbe documented that Plaintiff was in tears, which made Zerbe feel uncomfortable.

16. In June 2023, Tornai-Barrett advised Defendant's executive team that she had cancelled a meeting because it appeared that Plaintiff was too overwhelmed with her tasks. In response, Balestreri stated: "If we are not confident in [Plaintiff's] ability, then why are we hanging on to her . . . ."

17. Zerbe added, "I think that is a conversation we've been skirting around for months [because] we'd certainly rather she leave on her own. From my perspective, [Plaintiff] is still not capable of performing mundane tasks, she alienates our employees when she's supposed to be their primary resource and support, and her demeanor and emotional volatility (which she admitted to publicly on more than one occasion) negatively impact corporate operations because nobody wants to work with her."[10]

---

communications and was hired as a recent college graduate to a position that was not advertised. *Id.*

[9] Although it is not clear of the relevance, Plaintiff notes that Zerbe has no training in human resources and that, when Zerbe was hired, her position was not advertised.

[10] Plaintiff attempts to dispute the contents of Zerbe's text but does not dispute that the text was written. Because the asserted fact relates to the fact that the text was written, Plaintiff has failed to demonstrate a genuine dispute of material fact. In any event, even if the Court were to consider Plaintiff's attempts to dispute the contents of the text, Plaintiff has also failed to demonstrate a genuine issue of material fact in this regard. Plaintiff asserts that Zerbe could not recall an instance in which Plaintiff was abrasive, but Zerbe's text does not call Plaintiff abrasive, she negatively implicates Plaintiff's demeanor and calls her emotionally volatile; thus, Plaintiff has failed to create a genuine dispute of fact. *Contrast* Dkt. 26 at 4-5 ¶ 17, *with* Dkt. 28 at 7 ¶ 17.

18. Following this discussion, Balestreri recommended to Tornai that Defendant terminate Plaintiff's employment. When the recommendation was made in Summer 2023, Tornai responded that he "was just not yet there."

19. In Summer 2023, Tornai-Barrett also considered issuing a Performance Improvement Plan ("PIP") to Plaintiff; however, she believed that a written counseling would be more effective because she saw the crux of Plaintiff's issues as her unprofessional demeanor and did not believe there was a way to quantify that in a PIP.[11]

20. On August 10, 2023, Tornai-Barrett issued Plaintiff a Written Warning for her emotional conduct. Dkt. 26-15. In the Written Warning, Tornai-Barrett noted that the emotional conduct occurred again in an August 9, 2023 meeting, and she noted that, during that meeting, Plaintiff was in tears and clearly distraught over various situations. Tornai-Barrett noted that this repeated conduct was disruptive to operations and was the basis for the counseling. *Id.*

        a. Plaintiff asserts that she was berated during the August 9, 2023 meeting and told not to discuss the conditions of records at Defendant but also attributes her tears to a "gynecological condition." Dkt. 28 at 7 ¶ 20 & n.4, n.5.

21. Around the time that Defendant issued the Written Warning for emotional outbursts, in August 2023, Plaintiff reported to her medical provider that she was "easily annoyed or irritable nearly every day" and that her problems made it "very difficult" for her to do her work, take care of things at home, or get along with people.

22. The Written Warning advised Plaintiff that Defendant had made a decision to rehire its former HR Director, Nancy Hess, to decrease Plaintiff's tasks, as she seemed overwhelmed by her workload. The Written Warning further advised Plaintiff, and she acknowledged through her signature, that "future non-compliance of [sic] company policy or expected performance improvements may result in additional disciplinary action up to and including

---

Moreover, this critique is in accordance with Plaintiff's admission that she apologized to Defendant's employees for her demeanor. *See* Dkt. 26 at 4 ¶ 14 (asserting that Plaintiff apologized for demeanor); Dkt. 28 at 6 (not disputing paragraph 14). Similarly, the relevance of the fact that this critique was not shared directly with Plaintiff is unclear. Accordingly, Plaintiff has failed to demonstrate a genuine dispute of material fact.

[11] Plaintiff attempts to dispute the asserted fact that Tornai-Barrett considered a PIP, but the citations upon which she relies do not support such a dispute. Plaintiff relies on Balestreri's testimony that he advised Tornai-Barrett to create a PIP. Dkt. 28 at 7 ¶ 19. This only supports Tornai-Barrett's testimony that she considered one. Dkt. 26 at 5 ¶ 19. Moreover, Plaintiff notes that she was given a Written Counseling Report on August 10, 2023, which also supports Tornai-Barrett's testimony that she considered a PIP, decided it was not appropriate, and decided to issue a written counseling instead. *Contrast* Dkt. 26 at 5 ¶ 19, *with* Dkt. 28 at 7 ¶ 19. Accordingly, Plaintiff has not demonstrated genuine dispute of material fact.

termination of employment." Plaintiff acknowledges that she understood that Defendant need not give her a final written warning before it could terminate her.[12]

23. Like the Written Warning, Defendant's Employee Handbook provided that an employee may be dismissed for non-improvement in work performance after proper training and/or coaching by use of a Verbal or Written Counseling. Termination procedures generally included progressive disciplinary steps, and the "immediate MLT supervisor and/or MLT management are responsible for initiating disciplinary action." Dkt. 26-26 at 44. Moreover, "MLT reserved the right to skip any steps of action at its discretion." *Id.*[13]

24. Tornai's motto for Defendant was that Defendant take care of its people first. Rules and compliance were secondary to "feeding [Defendant's] staff," though Defendant believed there was sufficient time for an HR Director to do both. Failing to respond to employees was thus a performance deficiency.

25. On the same day that Defendant issued the Written Warning, Tornai-Barrett counseled Plaintiff after learning that Plaintiff had failed to follow up on an employee's request, made on August 2, 2023.[14]

---

[12] Plaintiff admits that she received the Written Warning, the receipt and contents of which are the only asserted facts by Defendant. Accordingly, Plaintiff has failed to demonstrate a genuine dispute of material fact. To the extent that Plaintiff is attempting to dispute the contents of the Written Warning, Plaintiff has failed to do so, because Plaintiff admits to crying and, although Plaintiff contends that the Written Warning contains no performance criteria, it clearly states the expectation that: "You are expected to work with Ms. Hess and your co-workers in a proactive manner free from emotional outbursts. If, during working operations, a high stress situation presents itself, I'd ask that you excuse yourself for a few minutes to regain composure." *Contrast* Dkt. 28 at 8 ¶ 22, *with* Dkt. 26-15 at 2. Thus, Plaintiff has also not demonstrated a genuine dispute of material fact as to the contents of the Written Warning.

[13] Plaintiff asserts "Denied" with respect to the asserted fact that an employee may be dismissed for non-improvement. Dkt. 28 at 8 ¶ 23. Despite this denial, Plaintiff then goes on to acknowledge the exact fact asserted by Defendant. *Id.* ("An employee may be dismissed for 'Non-Improvement' in work performance after proper training or coaching by use of Verbal or Written Counseling."). Accordingly, Plaintiff's attempt to dispute the asserted fact fails, and there is no genuine dispute of material fact. Nonetheless, the Court has modified the asserted fact to include additional information stated by Plaintiff regarding the disciplinary policy in the Employee Handbook. Plaintiff focuses on the progressive disciplinary steps set forth in the Employee Handbook, so the Court has included that such progressive discipline is generally intended, but, out of fairness, the Court has also noted that the Employee Handbook also notes that Defendant "reserved the right to skip any steps of action at its discretion." Dkt. 26-16 at 44.

[14] Plaintiff attempts to dispute the asserted fact that Tornai-Barrett counseled Plaintiff regarding the timeliness of responses to employee requests. Dkt. 28 at 9 ¶ 25. Plaintiff asserts: "Denied. No directions regarding timeliness for tasks to be performed were conveyed to Ms. Dancico while supervised by Mr. Balestreri." *Id.* In support, Plaintiff cites only her response to

26. Plaintiff acknowledges that it was her standard to respond to employees within 2-3 days; yet Defendant's records reflect a myriad of cases in which she did not meet her own standard. On a number of occasions, Plaintiff did not respond to employee emails within 2-3 days, leading employees to follow up or reach out to other management. *See* Dkt. 26-17 (no response after 8 days, leading Tornai-Barrett to reach out); Dkt. 26-18 (no response after 5 days, employee reaches out to Tornai-Barrett); Dkt. 26-19 (no response after 5 days); Dkt. 26-20 (no response for approximately one month). By way of specific example, one employee reached out on April 4 and 5, 2023 with respect to certain Family Medical Leave Act ("FMLA") forms. Dkt. 26-21 (April 5, 2023 email stating, "I'm following up on yesterday's discussion about sending the FMLA form to me. I realize its [sic] on your things to-do-list and you have many tasks to accomplish."). The employee then followed up on April 12, 2023, stating, "I was anticipating receipt of these forms by COB Monday, as discussed," at which point Plaintiff responded, "I can't really answer any questions regarding FMLA" and "apologize[d] for the lack of resolution you've been experiencing." *Id.* Plaintiff explains the delay with respect to this employee by asserting that "[t]here were additional conversations on the phone with [the employee] that withheld the FMLA forms from being sent." Dkt. 28-14 at 92:9-96:16.[15]

27. Tornai-Barrett received repeated concerns from unidentified employees about Plaintiff's response times, indicating that she those complaints occurred weekly or every other week.

28. In December 2023, a climate survey revealed continued employee dissatisfaction with Plaintiff's response times. Although Plaintiff received the survey results during her employment, she did not review them.[16]

---

asserted undisputed fact paragraph 6. *Id.* Plaintiff's response to asserted undisputed fact paragraph 6 relates only to the fact that Balestreri directed no performance concerns to Plaintiff in writing and does not relate to the asserted fact here. *See* Dkt. 28 at 6 ¶ 6. Accordingly, Plaintiff has failed to demonstrate a genuine dispute of material fact.

[15] Although Plaintiff attempts to dispute the entirety of Defendant's asserted facts regarding the timeliness of her responses, Plaintiff only specifically cites to any record evidence regarding the employee seeking FMLA forms. Because Plaintiff has failed to cite any record with respect to the other information asserted, Plaintiff has failed to establish a genuine dispute of material fact. Fed. R. Civ. P. 56(c)(1)(A). With respect to the employee seeking FMLA forms, Plaintiff cannot dispute the factual assertions regarding the employee's requests for the forms which are documented in email. Dkt. 26-21. Plaintiff has asserted that she timely responded to the employee's requests in reliance on her own deposition testimony. Dkt. 28 at 9 ¶ 26. That assertion is not supported by the emails which clearly reflect that the employee "anticipat[ed] receipt of these forms by COB Monday." Dkt. 26-21. Nonetheless, the Court has modified the asserted fact to include Plaintiff's explanation that she did not understand that the employee wanted the forms. Dkt. 28-14 at 92:9-96:16. Accordingly, there is no genuine dispute of material fact.

[16] Plaintiff does not dispute that the climate surveys revealed employee dissatisfaction with Plaintiff or that Plaintiff did not review them. *See* Dkt. 28 at 10 ¶ 28. Accordingly, Plaintiff has failed to demonstrate a genuine dispute of material fact regarding the asserted fact. Rather,

29. On or about June 8, 2023, Plaintiff emailed Tornai-Barrett a list of reports and deadlines, apologizing for an earlier error in understanding certain reporting requirements. In her email, she listed a deadline of July 31 for a 5500 Quarterly Report. Plaintiff did not complete the 5500 Quarterly Report, however, until on or about September 20, 2023.

30. In July 2023, Defendant was unable to claim approximately $20,000 in certain tax credits, which Plaintiff has acknowledged were part of her job duties at Defendant. Although Plaintiff attributed her inability to perform her task to a lack of access to an ADP platform, she does not recall escalating the issue to resolve the problem in time.[17]

31. On August 8, 2023, Tornai, Balestreri, Zerbe, Dustin Thorn (Vice President of Professional Services), Andrew Grenier (HR Generalist/Recruiter), Tornai-Barrett, and Plaintiff met to discuss an I-9 audit. The Executive Team had understood that Plaintiff was overwhelmed and confused regarding how to prioritize her tasks. They thus agreed to provide Plaintiff with additional support, including an administrative standdown, requesting that employees hold non-urgent requests until the end of August to allow Plaintiff time to meet deadlines

---

Plaintiff attempts to assert her own facts that the climate surveys were not used in support of her termination. This fact is unsupported by the record. Tornai-Barrett testified that the climate surveys were part of the decision-making. *See* Dkt. 26-10 at 74:8-21. Although Plaintiff asserts that Balestreri testified that he did not rely on any concerns from Defendant's employees, the cited deposition testimony upon which she relies does not relate to the decision to terminate Plaintiff but to some unidentified incident in 2023 that was brought up again in August 2024. *See* Dkt. 28-13 at 9:1-10:8 (discussing "why Garbriel Bell was telling Dustin Thorn about something he had that happened in January of 2023, in August of 2024?"); Dkt. 28 at 10 ¶ 28 (citing Dkt. 28-13 at 9:1-10:8). Similarly, Plaintiff asserts that Tornai did not rely on any employee counseling forms in his decision to terminate Plaintiff. Dkt. 28 at 10 ¶ 28. Although this assertion is supported by Tornai's deposition testimony, Tornai's reliance on "employee counseling forms" would appear to have no relationship to the asserted facts regarding "climate surveys." Accordingly, Plaintiff has failed to demonstrate a genuine issue of material fact.

[17] Plaintiff attempts to dispute the asserted facts regarding the tax credits. However, Plaintiff's deposition testimony, cited by both parties, clearly states that the tax credit was within her job responsibilities: "Q. Do you remember why you couldn't claim the credits, or why MLT could not? A. No. Q. . . . . Would any part of seeking the WOTC tax credits have been part of your job duties at MLT? A. Yes." Dkt. 26-1 at 63:8-64:13. Thus, Plaintiff's assertion that the "WOTC issue was not Ms. Dancico's job responsibility" is unsupported. Dkt. 28 at 10 ¶ 30. Furthermore, Plaintiff recalled that the WOTC tax credit issue was related to the ADP system and how she "could see the reports, but [she] couldn't open the tax credits and claim the credits." Dkt. 26-1 at 63:4-10. Plaintiff's job description, which Plaintiff cites, also does not support Plaintiff's proposition, because the job description indicates that part of Plaintiff's job duties includes the ADP system, which, as discussed above, was used for the WOTC tax credit. *See* Dkt. 26-2 at 2 ("Typical job duties will include (but are not limited to): . . . Responsible for maintaining the ADP HRIS system . . . ."). Accordingly, Plaintiff has failed to demonstrate a genuine issue of material fact in this regard.

associated with the I-9 audit. A Memorandum for Record was created following the meeting but not shared with Plaintiff.[18]

32. One of the deadlines related to the I-9 audit was completion of an after-action report to identify strong points, risks, completion, and outcome. Originally due on August 31, 2023, Plaintiff advised Defendant that she would have the I-9 after-action report completed on September 20, 2023; however, at the close of business on September 20, Plaintiff requested two additional weeks to complete the report.

33. Plaintiff never completed the I-9 after-action report.

34. In October 2023, Plaintiff received a bonus payment; however, her bonus, like those received by other employees, was based solely on the number of hours that she had contributed to winning a proposal effort.[19]

35. In December 2023, Plaintiff received an end-of-year bonus in the amount of $1,250. Tornai calculated end-of-year bonuses for all employees based on a cost-of-living adjustment and, only when warranted, performance.[20]

---

[18] Plaintiff admits that this meeting took place. Plaintiff objects to the extent that the fact asserted by Defendant states "MLT understood," because it is a legal entity rather than a natural one. Dkt. 28 at 10 ¶ 31. Plaintiff's objection in this regard is well-taken; the Memorandum for Record created following the meeting (and cited by Defendant) indicates that the views expressed were on behalf of the Executive Team. Accordingly, the asserted fact has been modified to reflect that information. Furthermore, the asserted fact has been modified to reflect Plaintiff's additional assertion that the Memorandum for Record was not shared with her. There is therefore no genuine dispute of material fact.

[19] Here, Plaintiff attempts to dispute that the bonus was for supporting a proposal rather than a performance- or merit-based bonus. Plaintiff cites Balestreri's testimony; essentially, his testimony was that he could not recall whether it was "a merit bonus or a bonus for supporting a proposal." Dkt. 28-13 at 71:3-10. But both parties also cite Tornai's deposition testimony, which makes clear that he does recall the payment. Tornai testified: "Yeah. Well, it's not a bonus. Had nothing to do with a bonus. When I win -- we do proposals. Folks get involved and if we win that contract, then I determine a pot of money and I refer to the hours that the employees contributed, and then I give them a little bit of money for their efforts." Dkt. 26-6 at 62:3-9. Tornai-Barrett also recalled the payment: "This payment was authorized by Mr. Tornai. I can see in this earnings statement that there is a proposal bonus for hours worked during a winning proposal effort." Dkt. 26-10 at 18:17-20. Balestreri's failure to recall does not contradict or demonstrate a dispute with Tornai's and Tornai-Barrett's testimony that the payment was not a merit-based bonus, but a bonus based on obtaining a project. Accordingly, there is no genuine dispute of material fact.

[20] Plaintiff attempts to dispute the asserted fact that the end-of-year bonus was based on a cost-of-living adjustment. She cites testimony from Balestreri, which refers to the payment as an end-of-year bonus, but Plaintiff cuts off the tail end of the excerpt where Balestreri explains: "Generally there's two components to end-of-year bonuses: Normally cost of living [remaining

36. On November 14, 2023, Tornai-Barrett set forth five priorities that Tornai had outlined for the HR Department. Four were assigned to Plaintiff, and one was assigned to Hess, the former HR Director that Defendant had brought back in August 2023 to assist Plaintiff.

37. Defendant viewed the priorities outlined in Tornai-Barrett's November 14, 2023 email as integral to Plaintiff's responsibilities as the Director of HR, as ongoing tasks, and as the same as the priorities that Defendant already expected Plaintiff to perform.[21]

38. Tornai responded to the email to cover an additional point: relationships. Specifically, Tornai advised Plaintiff that, as an HR professional, he expected her to work through pettiness and the day-to-day complaining about "bandwidth," and he would like to see her "Make it Work." He warned, "[w]e/you cannot continue to operate in this manner," but suggested "I haven't given up on you and the last thing I want to do is raise the White Flag." At that time, Tornai was unaware of the status of Plaintiff's work with respect to the projects contained within the November 14, 2023 email, which would alter his thinking.

---

excerpt cut off]." Dkt. 28-13 at 71:20-22. Plaintiff also notes that she was in the "top 50% of all employees of MLT." Dkt. 28 at 10 ¶ 35. Although it is numerically correct to state that Plaintiff was in the top 50% of all employees, that does not support Plaintiff's implication that therefore the payment was based on performance. Dkt. 28-7. This is because Plaintiff was the Director of HR and within the top ten employees on the organizational chart. Dkt. 26-8. Thus, when a top ten organizational employee is number 44 on a list tracking bonus amounts, it does not support that the bonus indicates good performance rather than cost of living. *Contrast* Dkt. 28-7, *with* Dkt. 26-8. Accordingly, there is no genuine dispute of material fact.

[21] Plaintiff attempts to dispute that these items were previously assigned to her in writing. Dkt. 28 at 10 ¶ 37. Plaintiff relies on Balestreri's deposition testimony to dispute that these tasks were assigned to Plaintiff. In his testimony, Balestreri testified: (i) "[t]hese tasks are integral to her responsibilities as Human -- the Director of Human Resources. These are not any different than what she should have been performing all along," Dkt. 28-13 at 83:4-7; and (ii) "[i]t's part of her job description. Not [as] specifically as it's laid out here, but these are inherent functions to those duties in her offer letter," *id.* at 83:10-13. The tasks assigned to Plaintiff were: (i) ADP WorkforceNow; (ii) Records Management; (iii) HR Processes; and (iv) Compliance. Dkt. 26-24. In her offer letter, Plaintiff was informed that her duties included, for example: (i) identifying "legal requirements and government reporting regulations affecting human resource functions and ensur[ing] policies, procedures, and reporting are in compliance"; (ii) responsibilities for "maintaining the ADP HRIS system"; (iii) preparing separation notices and related documentation; and (iv) developing and executing the human resource strategy in support of the overall business plan and strategic direction of the company." Dkt. 26-2. These duties, and others in the job description, generally line up with the more specific sub-duties identified in the job description. Accordingly, Plaintiff has not demonstrated a genuine issue of material fact.

Plaintiff also makes various references to "suspense dates"; in this context, it is unclear to what Plaintiff refers and what relevance it has to the asserted facts.

39. Although Tornai warned that "[w]e/you cannot continue to operate in this manner" and referenced "rais[ing] the White Flag," Plaintiff did not understand Tornai's email to suggest that she was not meeting Defendant's expectations.

40. Three days later, on November 17, 2023, Plaintiff responded to Tornai-Barrett's email, adding in red text a status with respect to the priorities outlined in the email. Of the four priorities assigned to Plaintiff, none were completed entirely. Tornai-Barrett did not find Plaintiff's status on her tasks satisfactory.[22]

        a. Plaintiff notes that the HR department was in need of additional resources and that Grenier had previously been terminated in October 2023 and was not replaced.

41. Likewise, on November 17, 2023, Balestreri observed that Plaintiff had not completed 95% of the work outlined in the November 14, 2023 email, and he thus advised, "She needs to be terminated." It is unclear whether Balestreri shared this observation with Plaintiff and Tornai does not recall whether Plaintiff was explicitly told that, if she did not complete these tasks, she would be subject to discipline.[23]

---

[22] Plaintiff did not dispute the asserted fact. But she asserts some additional facts. Where those facts are appropriately supported, they are included here and with respect to the next fact. To the extent that Plaintiff asserts that the "performance failures in Ms. Tornai-Barrett's Human Resources are attributed to understaffing," they are unsupported. Dkt. 28 at 11 ¶ 40. Plaintiff relies on Tornai's deposition testimony for this assertion, but the first citation by Plaintiff does not relate to any discussion of performance, and the second citation by Plaintiff only notes that HR was in need of additional support. Dkt. 28-15 at 99:4-100:8 (discussing an alcohol incident); *id.* at 102:14-16 (noting that HR was in need of additional support but not excusing performance issues). Accordingly, the Court will add this additional information only as supported by the record.

[23] Plaintiff states that the asserted fact is "Denied. See Response to No. 37." Dkt. 28 at 11 ¶ 41. Neither Plaintiff's response to asserted fact number 37 nor Plaintiff's response to asserted fact number 41 dispute or attempt to dispute that Balestreri sent such an email. Accordingly, Plaintiff has not demonstrated a genuine dispute of material fact with respect to the asserted fact.

The Court modifies the asserted fact to include that Balestreri did not inform Plaintiff about his view of her performance. In response to asserted fact number 40, Plaintiff asserted that "Mr. Tornai is not aware of any notice given to Ms. Dancico on November 14, 2024 about the deficiency of her performance." Dkt. 28 at 11 ¶ 40. But that does not accurately summarize Tornai's deposition testimony. Tornai was asked whether *Balestreri* informed "Ms. Dancico that her performance of November 17th, 2023 was insufficient," and he responded, "I am not aware of that." Dkt. 28-15 at 49:13-21. Similarly, Plaintiff asserts that "there was not any follow up given to her" in reliance on Tornai's deposition testimony. Tornai was asked whether "there [was] any follow-up to that email where Ms. Dancico was told if she doesn't complete these tasks she would be subjected to discipline," and he responded, "Not that I can recall." *Id.* at 50:4-12. Accordingly, the Court has modified the asserted fact to more accurately reflect Tornai's testimony.

      a.  That same day, Plaintiff responded to the November 14, 2023 email and proposed suspending her deadlines for certain tasks until January 31, 2024. No one responded to that email.[24]

42. Shortly thereafter, in November 2023, Balestreri discussed his recommendation for Plaintiff's termination with Tornai. He recommended termination because efforts to assist Plaintiff had not been successful and Balestreri had no faith or confidence that Plaintiff could support the duties of a growing organization. That discussion is not reflected in written documentation.[25]

43. Tornai agreed with the reasons for termination but reminded Balestreri of Defendant's policy not to terminate anyone over the holidays. Thus, Balestreri waited until mid-December to revisit the decision, obtain Tornai's final approval, and prepare to terminate Plaintiff in January after the holidays.[26]

---

[24] The Court adds these facts included in Plaintiff's response to asserted fact number 37.

[25] Plaintiff attempts to dispute the asserted fact that Balestreri discussed his recommendation of termination with Tornai in November 2023 by asserting that the decision to terminate occurred in December 2023. To begin with, the asserted fact only pertains to Balestreri making a recommendation. Accordingly, the one does not contradict the other; it is clear that Balestreri made the *recommendation* in November, and he testified that he discussed that *recommendation* with Tornai after he sent his email in November 2023. *See* Dkt. 26-3 at 73:10-74:14 (indicating that he discussed the recommendation to terminate "right before the Thanksgiving holiday"). The Court will, however, add Plaintiff's assertion, also based on Balestreri's testimony, that there was no written record of that conversation. *See id.* at 73:6-9. Plaintiff's other assertions about the proper steps to terminate someone are not relevant to the asserted fact. Accordingly, there is no genuine dispute of material fact.

[26] Plaintiff attempts to dispute the asserted fact by reference to her response to asserted fact number 42. In her response to asserted fact number 42, Plaintiff asserts that the first written document proposing termination is from December 21, 2023, which is consistent with the asserted fact. Dkt. 28 at 11 ¶ 42. Balestreri testified that Tornai agreed with the basis for termination but did not want to terminate Plaintiff based on the upcoming holidays. Dkt. 26-3 at 101:11-17. Plaintiff also relies on Tornai's deposition testimony for the assertion that: "When an MLT employee is terminated it is based on a written recommendation from a supervisor which is responded to in writing by Mr. Tornai who would make a record of the decision. No such record was made for Ms. Dancico." *Id.* Although it is unclear what relevance this has to the asserted fact, it is also not supported by the record. As discussed *supra*, in its Employee Handbook, Defendant "reserved the right to skip any steps of action at its discretion." Dkt. 26-26 at 44. Moreover, Tornai's deposition testimony was only that he generally did a Memorandum for the Record when he "personally terminated an employee" as he did with Grenier and that he did not recall whether he created such a record for Plaintiff. Dkt. 28-15 at 44:19-45:11 ("Q. Okay. Do you recall if there was any Memorandums for the Record regarding the termination of Melissa Dancico prepared by you prior to her termination? A. No."). Given that Tornai's response was

44. Consistent with his discussion with Tornai, Balestreri contacted Hess in December for her assistance with a termination memorandum for Plaintiff. Plaintiff's termination was for cause, for an inability to perform her duties.[27]

45. Tornai approved the recommendation because it had become evident that Plaintiff lacked the skills and abilities that Defendant needed. Specifically, Tornai noted that he looked at the ability to communicate and the ability to maintain and control emotions and determined that these skills "just were not there." Additionally, Tornai relied on his determination that, every time Plaintiff reported a compliance issue, his own research revealed that Defendant was in compliance, which reflected an inability by Plaintiff to perform as human resources manager.[28]

46. The termination memorandum was initially dated January 2, 2024, but that date was later changed to January 5, 2024, so that Tornai-Barrett could be present. On January 3, 2025, Plaintiff requested paid time off for January 5, 2024. Because Plaintiff would not be in the office, Balestreri moved the termination to January 4, 2024.

47. Plaintiff does not contend that Defendant terminated her employment because she made a PTO request for January 5, 2024.

48. On January 4, 2024, approximately 45 minutes before the meeting to terminate Plaintiff's employment, Plaintiff advised Tornai-Barrett that she had a surgery scheduled for January 18, 2024, and would be out for at least two weeks.

---

that he did not recall, Plaintiff cannot rely on this testimony to support that no documentation was created. Accordingly, Plaintiff has not demonstrated a genuine dispute of material fact with respect to the asserted fact.

[27] Plaintiff attempts to dispute the asserted fact, but it is unclear why or what Plaintiff disputes as she merely incorporates her response to asserted fact number 42, which appears to have no relevance here. Moreover, the record clearly demonstrates that Hess did prepare such documentation. Dkt. 26-26. The draft termination memorandum asserts that the basis for the termination as: "It has become evidence during your time of employment that your skills and abilities are not compatible with the needs of our organization." *Id.* Accordingly, Plaintiff has not demonstrated a genuine dispute of material fact with respect to the asserted fact.

[28] Plaintiff attempts to dispute the asserted fact, but it is unclear why or what Plaintiff disputes as she merely incorporates her response to asserted fact number 42, which appears to have no relevance here. Additionally, the cited portions of Tornai's deposition testimony support the asserted facts. *See* Dkt. 26-6 at 40:16-42:8 ("So I looked at all those abilities and skills sets and they just were not there."); *id.* at 53:7-9 ("The crying, which led to the performance because she couldn't focus on getting the work done because she was always in an emotional state."). Accordingly, Plaintiff has not demonstrated a genuine dispute of material fact with respect to the asserted fact.

49. Plaintiff had previously advised Tornai-Barrett around September 27, 2023, that her physician had found multiple cysts on her ovaries and that she would require surgery. At that time no surgery was scheduled, because she had additional appointments and bloodwork to complete first. In November 2023, Plaintiff followed up with Tornai-Barrett that surgery was still pending due to insurance issues.[29]

      a. At various points in September and November 2023, Plaintiff raised her anticipated need for surgery with Tornai-Barrett and others.[30]

50. Plaintiff had previously taken leave for surgery during her employment with Defendant without issue.

51. According to Plaintiff, the first step in requesting family medical leave at Defendant is advising one's supervisor and then completing the paperwork. After Plaintiff informed Tornai-Barrett of her surgery date, she went back to her office to begin the paperwork to request FMLA.

52. Because Defendant had already made the decision to terminate Plaintiff's employment, Tornai-Barrett contacted Hess to confirm that Dancico would have health insurance for the month of January even after her termination.[31]

---

[29] Defendant asserts that it assumes the facts relayed are true solely for purposes of the summary judgment motion. Dkt. 26 at 11 n.3. Plaintiff objects that this is impermissible. Plaintiff's argument is not well taken, as the Federal Rules of Civil Procedure expressly contemplate that a party might stipulate to an opposing party's facts "for purposes of the motion only." Fed. R. Civ. P. 56(c)(1)(A). That is what Defendant has done here, accepted Plaintiff's assertions regarding her conversations with her doctor for purposes of this motion only. Accordingly, any objection is overruled. *See Watchous Enters., LLC v. Mournes*, 87 F.4th 1170, 1179 (10th Cir. 2023) ("To be sure, the nonmovant is entitled to admit a fact solely for the purpose of resolving the summary-judgment motion."). Accordingly, Plaintiff's objection is overruled.

[30] Plaintiff asserts a series of facts in her response to asserted fact number 51. The Court has summarized those allegations as noted above. There appears to be some dispute about whether Tornai-Barrett was aware in the September through November 2023 period that Plaintiff may require surgery, but the Court construes this in favor of Plaintiff as the non-moving party. To the extent that Plaintiff asserts that she has previously obtained medical leave without pay (perhaps suggesting that Plaintiff had previously obtained FMLA leave), that assertion is not clear from the record cited. *See* Dkt. 28-5. Although the records reflect that Plaintiff was at the doctor's office on October 13, 2023, and that she was not charged PTO for the leave, there is no documentation suggesting that she was unpaid for this period. Accordingly, the facts adduced by Plaintiff are added as supported by the record and, construing these facts in Plaintiff's favor, there is no genuine dispute of material fact.

[31] Plaintiff admits that Tornai-Barrett contacted Hess to confirm that Plaintiff would have health insurance, but states, "[t]he remainder is denied." Dkt. 28 at 14 ¶ 52. It is unclear what

53. On January 4, 2023, Balestreri and Tornai-Barrett met with Plaintiff to inform her of her termination. In that meeting, they provided Plaintiff with the termination memorandum prepared by Hess, which documented that "it has become evident during your time of employment that your skills and abilities are not compatible with the needs of our organization." Though Plaintiff received the Termination Memorandum, she refused to sign it.[32]

54. When Tornai and Balestreri discussed the decision to terminate Plaintiff in November or December 2023, they did not discuss that Plaintiff may require surgery.

55. At the time Tornai accepted Balestreri's recommendation and authorized Plaintiff's termination, Tornai was unaware of any medical issues Plaintiff had been experiencing.[33]

56. No one other than Tornai and Balestreri have the authority to make executive decisions for Defendant. In the case of Plaintiff's termination, the decision rested with Tornai, who had the ultimate authority.[34]

---

specifically Plaintiff disputes and on what basis. Accordingly, Plaintiff has failed to demonstrate that there is a genuine dispute of material fact.

[32] Plaintiff does not dispute the facts asserted but instead makes an argument that essentially asserts Defendant failed to comply with the processes for discipline contained in the Employee Handbook. Argument is not appropriate for an undisputed statement of facts, and the facts asserted in response to fact number 53 are otherwise contained within this recitation of facts.

[33] Plaintiff does not deny that Tornai had no knowledge of her medical issues as asserted in fact number 56. However, in asserted fact number 55, Defendant relies on Balestreri's testimony to assert that it is also undisputed that Balestreri did not know, at the time he recommended Plaintiff for termination, that she might need surgery in the future. Dkt. 26 at 12 ¶ 55. Plaintiff denied this fact, relying primarily on her own deposition testimony. Plaintiff's first citation to her own deposition does not dispute the asserted fact. *See* Dkt. 28-14 at 179:1-11 (testifying "I can't recall exactly when or the date that occurred" and "I don't -- I don't remember"). But Plaintiff's second citation raises the possibility of a genuine dispute. *See id.* at 266:19-267:11 (stating that she told "Jerry" about her potential need for surgery "when she learned of it in late 2023, late summer of 2023, early fall of 2023"). Although this is a close question because Plaintiff's testimony is less than clear, the Court construes the testimony in the favor of the non-moving party and finds that there is a dispute. Ultimately, however, as discussed below, because Balestreri was not the decision-maker, this dispute is immaterial.

[34] Plaintiff attempts to dispute the asserted facts regarding who had authority at Defendant. Dkt. 28 at 15 ¶ 57. But in so doing, Plaintiff asserts: "Ms. Tornai-Barrett has check writing authority; Mr. Balestreri does not, but he does have authority to make executive decisions at MLT." *Id.* This does not contradict the asserted fact and would seem to only support the asserted fact. Plaintiff next asserts that program managers have authority to make hiring decisions, but it is unclear what relevance that has here. Plaintiff attempts to assert that such individuals also have

57. On December 1, 2023, a Defendant employee, "Jane Doe," informed Plaintiff that a visibly drunk U.S. Marine had touched her hand in a sexual manner or tried to grab her hand and said inappropriate things to her at Defendant's office that day. The Marine was put in a private space with a closed door until he was escorted off the premises, and Jane Doe was uncomfortable with the fact that the closed room was close to her desk.[35]

---

firing authority, but the cited testimony talks only in terms of program managers having authority to hire. *See* Dkt. 28-15 at 10:11-22 (asking "in terms of hiring personal or employees, who has the authority," "are the program managers able to hire whomever they want," and "has there ever been a hiring decision that you weren't aware of"). There is one question that relates to terminations, but it does not address who, other than Balestreri or Tornai, would have the authority to fire someone or that anyone has such authority. *See id.* at 11:3 ("Q. Okay. Has [there] ever been a termination decision at MLT that you weren't aware of? A. No."). The fact that Plaintiff asked for, and that Defendant indicated it would provide additional support, is discussed elsewhere in these facts. And Plaintiff's citation to her own deposition testimony regarding her requests for a performance review is unsupported by the record because those pages are not included in the exhibit filed. *See* Dkt. 28-14 (not including pages 151 or 152). Nor does her response to interrogatory number 3 relate to any request for a performance review. Dkt. 28-1 at 8. Plaintiff also suggests that Tornai "relied only on a couple of text messages exchanged with his executive team" in deciding to terminate Plaintiff, but that is not what Tornai was asked. Dkt. 28 at 15 ¶ 27. Tornai was asked specifically whether he relied on "verbal counseling records," Tornai responded that he did, and, when asked more specifically, stated that he relied on Exhibit D and text messages with the Executive Team. Dkt. 28-15 at 29:14-30:6. Thus, in the cited testimony, Tornai was only asked about what counseling records he relied upon, and it is unclear what Exhibit D in the deposition was; thus, the contention that Tornai relied only on a few text messages is unsupported. Plaintiff does not challenge at all that the ultimate decision rested with Tornai. Accordingly, Plaintiff has not demonstrated a genuine dispute of material fact.

[35] Plaintiff does not dispute the asserted fact but attempts to recharacterize the interaction as sexual assault. In her written statement, Jane Doe did not characterize this incident as sexual assault but describes the drunk Marine as attempting to grab her hand or to touch her hand in a sexual manner. Dkt. 26-32. When Jane Doe refers to a sexual assault in her statement, it is not in reference to this incident, but to a prior incident that occurred when she was in the U.S. Air Force, which also involved alcohol. *See id.* at 3 ("In 2005, while I served in the Air Force, I was sexually assaulted."); *id.* ("The sexual assault that I sustained involved alcohol."). Plaintiff cites other deposition testimony and that testimony also does not support the characterization of this incident as a sexual assault. *See* Dkt. 28-17 at 31:13-32:10 (Zerbe testifying that Jane Doe would not tell her about this particular incident and that "Jane Doe did tell me she was sexually assaulted but not in relation to this incident"); Dkt. 28-13 at 41:2-10 (simply referring to an "incident" that he discussed with Tornai); Dkt. 91:10-14 (Tornai discussing an "alcohol-related incident"). Thus, the records cited do not support the characterization of this incident as a sexual assault, which has a very particular meaning. Plaintiff also asserts additional facts related to the incident with Jane Doe that the Court will incorporate as appropriate and where material, but they are not directly responsive to the asserted fact.

58. Plaintiff reported the incident to Tornai, who arranged for a meeting that same day with Plaintiff, Defendant's executives, and Tiffany Goldberg, an employee who was assigned to the contract involving the Marine.

59. At the December 1 meeting, Plaintiff advised that they should not be meeting; rather, the proper way to investigate a sexual harassment or assault claim was to allow the designated officer to collect statements and provide those statements to whomever would be investigating, which in this case she identified as the United States Marine Corps because the individual was not Defendant's employee, but a Marine.

60. Tornai asked Plaintiff if Jane Doe wanted to do an investigation, and Plaintiff replied that she believed so. Tornai then followed Plaintiff's advice by ending the meeting and instructing Plaintiff, as Director of HR, to obtain Jane Doe's statement.

61. Plaintiff spoke to Jane Doe that afternoon, and Jane Doe agreed to provide a written statement after she had time to collect herself.

62. Jane Doe also told Plaintiff that she wanted her statement shared with the U.S. Marine Corps Inspectors General, but Plaintiff did not share that with anyone at Defendant until December 11, 2023, as she was out of the office due to COVID.[36]

63. On the same day as the incident, Tornai followed his standard procedure by contacting Paul Aboud, the United States government employee serving as the Contracting Officer Representative for the relevant contract. Tornai advised Aboud that an alcohol-related incident had occurred and that Goldberg had the details. He further advised that HR had been looped in and was conversing with Jane Doe.[37]

64. On Monday, December 4, 2023, Tornai received a reply from Aboud, stating that a Colonel Cox would address the situation via military channels and that the Marine was barred from Defendant's premises until he completed rehab and could conduct himself professionally.

---

[36] Plaintiff attempts to dispute the asserted fact, by asserting that she "was not out of the office due to COVID," but was working remotely. Dkt. 28 at 17 ¶ 63. However, Plaintiff goes on to assert that she was not involved in the investigation of Jane Doe's complaint because she was "out of the office." *Id.* Plaintiff does not otherwise address the facts asserted by Defendant, and therefore there is no genuine dispute of material fact.

[37] Plaintiff attempts to dispute that Tornai's actions were not "*the* standard procedure," but that is not what is asserted by Defendant. Dkt. 28 at 17 ¶ 64 (emphasis added). Defendant's asserted fact is the Tornai followed "*his* standard procedure." Dkt. 26 at 13 ¶ 64 (emphasis added). Plaintiff then asserts that Tornai "took over the investigation to serve MLT's customer," but the testimony upon which she relies merely states that Goldberg was concerned about the impact of the incident on both Jane Doe and the government customer. Dkt. 28 at 17 ¶ 64 (citing Dkt. 28-15 at 99:4-100:8); *see also* Dkt. 28-15 at 100:13-14. Plaintiff also asserts additional facts related to the incident with Jane Doe that the Court will incorporate as appropriate and where material, but they are not directly responsive to the asserted fact.

18

Aboud also expressed his understanding that Jane Doe did not wish to make a statement. In response, Tornai advised that Defendant had learned that Jane Doe would make a statement. Tornai indicated that HR would review the statement, but that Plaintiff had just tested positive for COVID.[38]

65. Had Plaintiff not been out of the office, Tornai would have assigned following up with Jane Doe to collect her statement to Plaintiff as discussed on December 1, 2023. But Tornai had learned from the government that, if Jane Doe was going to make a statement, they wanted it as soon as possible. Accordingly, Tornai asked Jane Doe's supervisor, Tornai-Barrett, to follow up with her. In doing so, Tornai also learned that Jane Doe was also writing a "lessons learned" for Defendant's internal processes, which he advised that the government did not need and could be completed at a later date.[39]

66. On December 6, 2023, Tornai-Barrett emailed Jane Doe to come to her office for a quick meeting. Before Jane Doe saw this email, Tornai-Barrett saw Jane Doe in person and asked about the status of the statement. Understanding that Jane Doe was still working to complete it, Tornai-Barrett offered to allow Jane Doe to go home so that she could complete it uninterrupted. Jane Doe agreed to do so. That afternoon, Jane Doe saw Tornai-Barrett's earlier email and inquired into the meeting's purpose and asked that Tornai-Barrett be considerate of her emotions. Tornai responded shortly thereafter advising Jane Doe that she could disregard the meeting request, because they had already spoken. She emphasized that Jane Doe was not being forced to write a statement but did indicate that the customer (i.e. the government) was asking for it so that they could move forward with disciplinary action on their side. Tornai-Barrett indicated: "this is ONLY if you want to provide a statement. The customer [sic], nor MLT, is asking or forcing you to do."[40]

---

[38] Plaintiff attempts to dispute the asserted fact by noting that the cited deposition testimony "only corroborates that the emails exist." Dkt. 28 at 19 ¶ 64. Plaintiff apparently did not note that Defendant also cited the emails themselves. *See* Dkt. 26 at 14 ¶ 65 (citing "12/4/23 Emails, included in Ex. 30," which is included on the docket as Dkt. 26-30). Because Defendant also cited the December 4, 2023 email, this is sufficient to support the asserted fact. Accordingly, Plaintiff has failed to demonstrate a genuine issue of material fact.

[39] Plaintiff attempts to assert the disputed fact simply by incorporating her prior dispute. *See* Dkt. 28 at 19 ¶ 66 (See Response to No. 63). Presumably, Plaintiff is disputing that she was "out of the office with COVID," since Plaintiff previously asserted that she was working remotely, but again Plaintiff conceded in her response to asserted fact number 63 both that she had COVID and that she was "out of the office." Dkt. 28 at 17 ¶ 63. Accordingly, there is no genuine dispute of asserted fact.

[40] Plaintiff attempts to dispute the asserted fact; however, the asserted fact tracks the emails between Tornai-Barrett and Jane Doe. Dkt. 26-31. Plaintiff cites deposition testimony from Tornai-Barrett discussing another meeting – not the December 6, 2023 meeting that Tornai-Barrett indicated was not necessary. *See* Dkt. 28-16 at 13:19-14:4 (referring to an intent to "meet with Ms. Doe to improve the process and here her lessons learned). The other deposition testimony cited relates to performance reviews and does not appear to have any relevance here. *See id.* at

19

67. Later, on December 6, 2023, Jane Doe provided Tornai, Balestreri, Tornai-Barrett, and Plaintiff an emailed copy of her statement from the incident and a copy of her Lessons Learned. In those documents, Jane Doe indicated that she felt pressured to provide the statement. And, as part of her Lessons Learned, Jane Doe expressed some dissatisfaction with how the matter was handled on the day of the incident.

68. Upon receipt of Jane Doe's statement, on December 6, 2023, Tornai replied all via email thanking Jane Doe for her statement and advising that he would be forwarding the statement to the "RFA Contracting Officer Representative."

69. Plaintiff testified that she believed that Tornai was forwarding Jane Doe's statement to the wrong person, because Jane Doe had shared with her the desire to have the Marine Corps Inspectors General investigate. But Plaintiff had not shared that information with Defendant, nor had she raised any concern regarding to whom the statement was being provided in response to Tornai's email. Instead, Plaintiff also replied all and thanked Jane Doe for her statement.[41]

70. The next day, on December 7, Plaintiff sent an email to Tornai, Tornai-Barrett, and Balestreri, Re: "Sexual Harassment Complaint Process," writing: "Sorry for the questions, just saw the emails and statements sent to a large audience and didn't want to miss something. Did someone ask [Jane Doe] to complete her statement of the events on Dec. 1st by Dec. 6th? Has there been an investigator identified from the command or a process for maintaining confidential information for a potential investigation?"

71. Tornai replied to Plaintiff's email the same day to answer her questions and to explain that any assigned investigator would need to present a Letter of Assignment.

72. Plaintiff replied, "I apologize if my asking came off in such an abrupt manner. I didn't want to miss anything important, but you [have] it under control."

73. Nonetheless, after providing advice in her capacity as the Director of HR on December 1 as to how to conduct the investigation and after raising her two questions via email in that

---

20:8-21:10 (discussing performance evaluations). Accordingly, there is no genuine dispute of asserted fact.

[41] Plaintiff attempts to assert the disputed fact by citing a myriad of additional information. With respect to the specific fact alleged here, Plaintiff asserts that she informed Tornai-Barrett that Jane Doe wanted her complaint sent to the Inspectors General Office. Dkt. 28 at 21 ¶ 74. But, as the cited testimony and the previous facts established here demonstrate, Plaintiff did not inform Tornai-Barrett until her "return to the office," which around December 11 – after the email had already been provided to Aboud. Dkt. 26 at 13 ¶ 63 (asserting that Plaintiff returned to the office on December 11, 2023); Dkt. 28 at 17 ¶ 63 (not disputing that her return to the office was December 11, 2023); Dkt. 28-14 at 24:2-8 ("I shared that with Clarissa upon my return to the office."). Many of the additional facts asserted by Plaintiff are already contained within the facts previously recited or contained in subsequent asserted facts.

same capacity, Plaintiff claims that, for a couple of days, she started receiving emails about administrative items with which she would not normally be tasked and which she viewed as micromanagement. She was also not tasked with inputting bonus data into the ADP system.

74. When Plaintiff returned to the office on or about December 11, 2023, Plaintiff shared with Tornai-Barrett that she felt that Defendant was retaliating against her for her advice on December 1 and her questions on December 7. Although Plaintiff does not remember her specific words, she advised Tornai-Barrett that Defendant should not have responded to the government except through Plaintiff, because she believed that she was the investigator designated by the Employee Handbook and its sexual harassment training – though she was not.[42]

   a. That same day, Plaintiff received a Star Gram award from a fellow employee.

75. After Tornai provided Jane Doe's statement to the RFA Contracting Officer Representative, as stated in his December 6 email, he also facilitated an interview between Jane Doe and an assigned investigator, with whom Jane Doe voluntarily agreed to speak. Tornai did not understand that Plaintiff or Jane Doe had any concerns regarding how the investigation into Jane Doe's complaint unfolded.[43]

---

[42] Plaintiff objects that Defendant accepts these facts as true only for purposes of summary judgment. As discussed *supra*, Defendant's limited stipulation as to Plaintiff's version of events is proper. *See* Fed. R. Civ. P. 56(c)(1)(A). The other facts alleged by Plaintiff are generally included in this recitation of facts. Importantly, Plaintiff does not dispute that the Employee Handbook did not designate her as the official investigator for any sexual harassment complaint in these circumstances. Dkt. 28 at 22-23 ¶ 75 (failing to address assertion in asserted statement of fact number 75 that "she was not"). Although Defendant does not point to the particular place within the Employee Handbook upon which Defendant relies for this proposition, it is undisputed and appears to be drawn from the portion of the Employee Handbook which discusses investigations generally without referencing an assigned investigator or which discusses "MLT's ability to investigate" – that is discussing Defendant as an entity investigating without reference to a specific investigator. Dkt. 26-16 at 42. Accordingly, there is no genuine dispute of material fact.

[43] Plaintiff attempts to dispute the asserted fact by stating: "Admitted Mr. Tornai provided Jane Doe's statement to his civilian client, Mr. Aboud. The remainder of the undisputed facts are disputed. See Response to Nos. 70 and 75." Dkt. 28 at 23 ¶ 76. To begin with, it is difficult to see how the mass of information cited in Plaintiff's prior responses specifically address *this* asserted fact. None of the information provided by Plaintiff appears to relate to the interview between Jane Doe and the investigator; accordingly, this fact is undisputed. Moreover, Plaintiff's citations to a myriad of record evidence with respect to events that unfolded do not contradict Tornai's understanding of the circumstances. Indeed, in her responses to asserted facts numbers 70 and 75, Plaintiff recites that she complained to Tornai-Barrett but does not assert that she raised any

76. Likewise, when Balestreri and Tornai discussed the decision to terminate Plaintiff's employment, they did not discuss any concerns that Plaintiff may have had concerning the investigation. When Balestreri made his recommendation for termination in November 2023 (which Tornai accepted, subject to it occurring after the holidays), the December 1 incident involving Jane Doe had not yet occurred.[44]

77. On March 19, 2024, Jane Doe submitted her resignation.

### III. LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The facts shall be viewed, and all reasonable inferences drawn, in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255. "(A) party opposing summary judgment may not simply rest on the allegations of his complaint, but must instead come forward with specific evidence showing the existence of a genuine issue of fact." *Muhammad v. Giant Food*, 108 F. App'x 757, 764 (4th Cir. 2004) (citing *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991)).

---

concerns regarding the investigation with Tornai outside of the initial meeting on December 1, 2023, before any investigation began. Accordingly, there is no genuine dispute of material fact.

[44] Plaintiff disputes on the second sentence of the asserted fact. Plaintiff's dispute in this regard is perplexing, because Defendant is referring to Balestreri's recommendation in November 2023. It cannot be disputed that Balestreri made a recommendation that Plaintiff be terminated in November 2023 (Dkt. 26-25) ("She needs to be terminated."), and it is undisputed that the incident involving the Marine and Jane Doe occurred on December 1, 2023 (Dkt. 26-32). The Court does not understand Plaintiff's attempted dispute that: "Balestreri testified, subject to objection, that he did not discuss Jane Doe's investigation with Mr. Tornai in November 2023." Dkt. 28 at 23 ¶ 77. The deposition testimony cited also only reflects an objection to a question about conversations in *December* 2023. Dkt. 26-3 at 107:5-108:3. But even then, after defense counsel rephrased the question, Plaintiff failed to object to the question and response: "[D]id you ever have discussion with Mr. Tornai regarding any concern Ms. Dancico had expressed about the investigation into Jane Doe? A. No." *Id.* Accordingly, there is no genuine dispute of material fact in this regard.

## IV. ANALYSIS

Defendant seeks summary judgment on each of the remaining counts: (i) Count 1, a Title VII retaliation claim; (ii) Count 3, an FMLA retaliation claim; and (iii) Count 4, an FMLA interference claim. Because the analysis is similar, the Court will discuss the retaliation claims together, before discussing the FMLA interference claim.

### A. Retaliation

Generally, to avoid summary judgment on a Title VII or FMLA retaliation claim, a Plaintiff must come forward with either direct evidence of retaliation or rely on the familiar *McDonnell-Douglas*[45] burden shifting framework. Direct evidence is "evidence of conduct or statements that both reflect directly on the alleged discriminatory attitude and that bear directly on the contested employment decision." *Johnson v. Mechs. & Farmers Bank*, 309 F. App'x 675, 681 (4th Cir. 2009) (quoting *Taylor v. Va. Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (*en banc*)). The Fourth Circuit has recognized that, "in the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced." *Johnson v. United Parcel Serv., Inc.*, 839 F. App'x 781, 783 (4th Cir. 2021).

In her Opposition, Plaintiff asserts two alleged pieces of direct evidence of retaliation: (i) an affidavit by Grenier, relied upon for the FMLA retaliation claim; and (ii) Tornai's conduct with respect to the Jane Doe investigation, relied upon for the Title VII retaliation claim. Dkt. 28 at 4. Preliminarily, there are several difficulties with Plaintiff raising this argument for the first time in response to a motion for summary judgment. As Defendant notes, Grenier was never identified by Plaintiff as having any knowledge of facts relating to her allegations of retaliation. *See* Dkt.

---

[45] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (establishing a framework for discrimination cases whereby: (1) the plaintiff establishes a *prima facie* case, then (2) the defendant must offer a legitimate, nondiscriminatory reason for the action taken, and then (3) the plaintiff must show that the offered explanation is pretextual).

28-1 at 3, Resp. to ROG 1 (identifying Grenier only as having "knowledge of the selection processes and preselection of managerial and other key roles at MLT Systems LLC and the duties of Human Resources personnel"). Moreover, in her interrogatory responses, Plaintiff did not identify either piece of direct evidence as part of the factual basis of her claims. *See id.* at 10-11, Resp. to ROG 5. Nonetheless, the Court considers this purportedly direct evidence and finds that neither qualifies as direct evidence of retaliation with respect to her termination.

It is noted that Grenier was Plaintiff's HR subordinate and was terminated in October 2023.[46] In his declaration, Grenier avers that around October 2023 he learned that Plaintiff would need surgery and, shortly thereafter, Tornai-Barrett told Grenier that he could expect to perform more work because Defendant would be short-staffed while Plaintiff was on leave. Dkt. 28-2 ¶ 6. Grenier avers that Tornai-Barrett was "clearly annoyed by this" because "she had a scowl on her face" and "rolled her eyes." *Id.* ¶ 7. This is not direct evidence that Plaintiff's January 2024 termination was retaliatory. Courts uniformly recognize that subjective interpretations of facial expressions or body language do not constitute direct evidence of animus. *See Weems v. Dallas Indep. Sch. Dist.*, 260 F. Supp. 3d 719, 727 (N.D. Texas 2017) ("Weems subjective belief regarding Basurto's tone and facial expression, without more, is insufficient to constitute direct evidence of disability discrimination.").[47] Moreover, Tornai-Barrett was not the decision-maker; thus, this

---

[46] Of note, Grenier's declaration asserts that his interaction with Tornai-Barrett occurred in mid-October, but Plaintiff submitted evidence that Grenier was terminated as of October 4, 2023. *Contrast* Dkt. 28-2, *with* Dkt. 28-4.

[47] *See also EEOC v. Chipotle Mexican Grill*, 98 F. Supp. 3d 198, 213 (D. Mass. 2015) ("But that kind of evidence – Connell's subjective interpretation of another person's facial expression – is not remotely sufficient, standing alone, to show direct evidence of discrimination."); *Hutton v. City of Berkley Police Dep't*, 2014 WL 4674295, at *10 (N.D. Cal. Sept. 9, 2014) (finding that "subjective evidence" that officer "used a certain tone of voice and had a facial expression" does not constitute direct evidence of discriminatory motive).

24

interaction with Tornai-Barrett in October 2023 is disconnected from Tornai's November 2023 decision, solemnized in December 2023, to terminate Plaintiff in January 2024. *See* Dkt. 26 at 12 ¶ 56 (asserting Tornai was unaware of Plaintiff's medical issues); Dkt. 28 at 15 (not disputing asserted fact number 56); *Laing v. Fed. Express Corp.*, 703 F.3d 713, 717 (4th Cir. 2013) (direct evidence of discrimination must "bear directly on the contested employment decision"). Accordingly, the Grenier Affidavit does not constitute the necessary direct evidence of retaliation.

With respect to the Plaintiff's argument regarding Tornai's conduct, even assuming that Plaintiff had provided evidence that Tornai failed to follow proper procedures because of "client relations purposes" (which she has not),[48] such conduct is circumstantial rather than direct evidence. *See, e.g., Mount v. Johnson*, 174 F. Supp. 3d 553, 565 (D.D.C. 2016) (discussing "[t]ypical means of providing sufficient circumstantial evidence from which a retaliatory motive could be inferred include "that the employer failed to follow established procedures or criteria"); *cf. Stennis v. Bowie State Univ.*, 2019 WL 1507777, at *10 (D. Md. Apr. 5, 2019) (recognizing that, within the *McDonnell-Douglas* circumstantial evidence framework a "failure to abide by regular procedures [is] probative of pretext"). In short, nothing about Tornai's conduct "reflects directly the alleged discriminatory attitude" that Plaintiff alleges. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (finding statements regarding "hiring people at that age" was not direct evidence of discrimination). Accordingly, Plaintiff also fails to establish that there is direct evidence of Title VII retaliation.

---

[48] As discussed *supra*, the evidence that Plaintiff relied upon for this proposition is testimony from Tornai regarding *Goldberg's* concerns about the impact of the incident on both Jane Doe and the customer – *not* Tornai's concerns. Dkt. 28 at 17 ¶ 64 (citing Dkt. 28-15 at 99:4-100:14); *see also* Dkt. 28-15 at 100:13-14.

Because Plaintiff has failed to establish direct evidence of FMLA- or Title VII-based retaliation, Plaintiff must proceed on her claims under the established *McDonnell-Douglas* burden shifting framework. In this regard, Defendant argues that Plaintiff cannot establish a *prima facie* case with respect to Plaintiff's Title VII retaliation claim (Count 1) and cannot establish pretext with respect to either retaliation claim (Counts 1 and 3).[49] Those arguments are discussed below.

### i. Title VII Retaliation *Prima Facie* Case

Plaintiff does not directly address Defendant's argument with respect to her Title VII *prima facie* case. To establish a *prima facie* case of retaliation, a plaintiff must demonstrate that: (i) she engaged in a protected activity; (ii) the employer acted adversely to her; and (iii) there was a causal connection between the protected activity and the asserted adverse action. *See Colley v. ISS Facility Servs., Inc.*, 2025 WL 1743498, at \*1 (4th Cir. June 24, 2025). An employee may engage in a protected activity, in several ways, but, of relevance here, Plaintiff contends that she opposed employment discrimination. Dkt. 28 at 2 (arguing "[o]pposition to employment discrimination qualifies as a protected activity"). Title VII's so-called Opposition Clause prohibits retaliation against an employee who has "opposed any practice made an unlawful employment practice" by Title VII. 42 U.S.C. § 2000d-3(a); *DeMasters v. Carilion Clinic*, 796 F.3d 409, 416 (4th Cir. 2015). The Fourth Circuit has interpreted the Opposition Clause broadly, to include conduct that an employee believes is unlawful, and has instructed that it must be evaluated "as a series of discrete acts." *Id.* at 417. And, the Fourth Circuit has instructed that the "touchstone" for whether conduct constitutes oppositional activity is whether (1) the plaintiff "communicates to her

---

[49] Defendant and the Court assume for purposes of the motion for summary judgment that Plaintiff could establish her *prima facie* case with respect to her FMLA retaliation claim.

employer a belief that the employer has engaged in . . . a form of employment discrimination," and (2) the plaintiff "reasonably believes" that conduct "to be unlawful." *Id.* at 418.

With respect to her protected activity, Plaintiff alleges that she engaged in oppositional activity on December 1, 2023, and December 12, 2023. Dkt. 28 at 2.[50] As an initial matter, Plaintiff did not allege that her December 1, 2023 meeting with the Executive Team constituted a protected activity in her Complaint. Dkt. 1 at 4-5 ¶ 28 (alleging that on December 1, 2023, Plaintiff "advised that an investigation was necessary" and "advised that a statement from [Jane Doe] would be needed"); Dkt. 15 (failing to identify any protected activity on December 1, 2023, in opposition to the motion to dismiss). Indeed, the Court specifically noted that "Plaintiff does not identify or make an argument with respect to any particular protected activity," and found that the only potential allegation of a Title VII protected activity in the Complaint was the December 12, 2023 conversation between Plaintiff and Tornai-Barrett. Dkt. 17 at 10. The Court permitted Plaintiff to file an amended complaint, in which Plaintiff could have specifically noted her claim that her December 1, 2023 meeting constituted a protected activity, but Plaintiff chose not to do so. Dkt. 17 at 15. Courts in this Circuit are clear that "a plaintiff may not raise new claims after discovery has begun without amending [her] complaint." *Cloaninger ex rel. Est. of Cloaninger v. McDevitt*, 555 F.4th 324, 336 (4th Cir. 2009); *Massaro v. Fairfax Cnty.*, 2022 WL 4464556, at *6 (E.D. Va. Feb. 15, 2022) (holding that a Title VII plaintiff could not amend his complaint to allege a new protected activity via an opposition to summary judgment); *Ikome v. CSRA, LLC*, 2019 WL 3253391, at *8 (D. Md. July 19, 2019) (granting summary judgment on retaliation claim where

---

[50] As this Court previously noted, Plaintiff cannot attempt to base any retaliation claim on her opposition to Defendant giving preference to U.S. Marines, because military status is not a protected characteristic under Title VII and, thus, this could not reasonably be perceived as objecting to a violation of Title VII. *See* Dkt. 17 at 9.

"Ikome failed to allege in his Complaint that he engaged in protected activity when his counsel sent the April 19, 2017 letter; nor did he seek leave to amend to add this allegation"). Accordingly, because Plaintiff did not raise the December 1, 2023 meeting as a protected activity in her Complaint, Plaintiff cannot now attempt to amend her Complaint by means of her opposition to summary judgment. Nonetheless, the Court will consider both alleged Title VII protected activities.

With respect to the December 1, 2023 meeting, Plaintiff has not cited record evidence suggesting that she put Defendant on notice and communicated that she was opposing what she viewed as a potential unlawful employment practice. Indeed, as Plaintiff alleged in her Complaint, she "advised" Defendant. Dkt. 1 at 4-5 ¶ 28. In her Opposition, Plaintiff asserts: "At this meeting, Ms. Dancico opposed MLT's handling of the incident and stated it was improper to allow a drunk man who sexually harassed an employee to stay in MLT's conference room because he was too drunk to drive home." Dkt. 28 at 20. To begin with, this assertion is unsupported by any citation to the record. Additionally, this assertion that it was improper does not convey that Plaintiff viewed it as a Title VII violation or as discrimination. *See DeMasters*, 796 F.3d at 418 (requiring that an employee must "communicate[] to her employer a belief that the employer has engaged in . . . a form of employment discrimination"). Plaintiff's assertion that she "expressed opposition" to Jane Doe's identity being shared "on December 1, 2023, to the executive team, the day of the sexual assault" is likewise unsupported by any citation to the summary judgment record. Dkt. 28 at 2. Furthermore, again, it is unclear how this would convey a belief that Defendant was violating Title VII by doing so. *See DeMasters*, 796 F.3d at 418; *see also Morris v. McCarthy*, 825 F.3d 658, 673-74 (D.C. Cir. 2016) (recognizing that "job-related policy discussions are not protected" and holding that "[l]abeling generalized policy disagreements a form of protected activity would

28

risk insulating employees in civil rights roles from adverse employment action, because such debates are presumably part of their everyday duties").[51]  Again, now in her summary judgment briefing and unsupported by a record citation, Plaintiff asserts that she opposed, where she previously alleged that she advised, Defendant's handling of the immediate aftermath of the incident. *Contrast* Dkt. 1 at 4-5 ¶ 28, *with* Dkt. 28 at 20 (not providing a citation for allegations regarding what happened "[a]t this meeting").[52]  Thus, Plaintiff has not cited any record evidence suggesting that she engaged in oppositional, protected activity at the December 1, 2023 meeting.[53] Accordingly, Plaintiff has not demonstrated that a genuine dispute of material fact exists with respect to the December 1, 2023 meeting.  And the undisputed record on summary judgment establishes that Plaintiff did not engage in a protected activity on December 12, 2023.

Plaintiff next relies on a December 12, 2023 interaction with Tornai-Barrett. Dkt. 28 at 22-23 ¶ 75.  In this regard, Plaintiff has alleged that she engaged in a protected activity – complaining to Tornai-Barrett that "she felt she was being retaliated against as the result of

---

[51] To the extent that Plaintiff suggests that her criticisms followed Jane Doe's own criticisms of the handling of the investigation, such criticisms were only conveyed on December 6, 2023 – *after* December 1, 2023. Dkt. 32.  Thus, Plaintiff's allegations in this regard (again unsupported by a citation to the record) do not support that Plaintiff engaged in oppositional activity on December 1, 2023. Dkt. 28 at 20.

[52] Moreover, Plaintiff's unsupported assertion that Plaintiff advised that the decision of how to handle the harassment "should not involve clients of MLT Systems" is contradicted by Plaintiff's responses to the asserted undisputed facts. *Contrast* Dkt. 28 at 20, *with* Dkt. 28 at 17 (not disputed asserted fact number 60), *and* Dkt. 26 at 15 ¶ 60 (asserting that Plaintiff identified the United States Marine Corps as the entity to investigate).  Here, the United States was Defendant's client and Plaintiff's testimony was that she advised, "since the individual was outside of our command, it would be turned over to the United States Marine Corps inspector general to investigate." Dkt. 26-1 at 201:18-20.

[53] Further undermining any suggestion that the December 1, 2023 meeting involved oppositional activity, is Plaintiff's December 6, 2023 email telling the Executive Team, in relation to how the incident was being handled: "I didn't want to miss anything, but you got it under control." Dkt. 26-33.

attempting to properly investigate Jane Doe's sexual harassment complaint." *Id.* (citing 28-1 Rog. Resp. 9 at 17-18).[54] But Tornai-Barrett was not the decision-maker here – Balestreri recommended termination and Tornai determined termination was appropriate – and Plaintiff cites no record evidence suggesting that Tornai, or even Balestreri, had knowledge of Plaintiff's complaints to Tornai-Barrett. As the Fourth Circuit has instructed, "the causation prong of a *prima facie* case of retaliation requires that a plaintiff demonstrate that the decisionmaker imposing the adverse action have actual knowledge of the protected activity." *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 125 (4th Cir. 2021). Plaintiff has not produced such evidence here. Accordingly, Plaintiff cannot establish the causation prong of her *prima facie* case with respect to the December 12, 2023 interaction with Tornai-Barrett.

In short, even assuming that Plaintiff was permitted to rely on the December 1, 2023 meeting as a protected activity, she has not demonstrated relying on record evidence that she engaged in oppositional activity during the meeting. Thus, she fails to establish a *prima facie* case at the outset with respect to that meeting. With respect to the December 12, 2023 interaction with Tornai-Barrett, the Court accepts that Plaintiff has relied on admissible evidence demonstrating that she engaged in a protected activity. Here, however, she fails to establish her *prima facie* case based on a lack of causation, because she failed to demonstrate that any decision-maker had knowledge of her protected activity. Thus, Plaintiff has failed to establish a *prima facie* case of retaliation under Title VII.

---

[54] Defendant suggests that the nature of Plaintiff's protected activity was again advice regarding how the investigation should proceed. Dkt. 26 at 21. Defendant correctly argues that some of this advice is in line with Plaintiff's job duties and thus cannot constitute a protected activity. *See Morris*, 825 F.3d at 673-74. But Defendant does not acknowledge Plaintiff's claim that she complained of retaliation, which constitutes a protected activity.

ii. Pretext

Assuming that Plaintiff could establish a *prima facie* case, Defendant has produced a legitimate, non-discriminatory basis for its decision to terminate Plaintiff; namely, performance issues. Dkt. 26-24 ("We/you cannot continue to operate in this manner."); Dkt. 26-25 ("She needs to be terminated."); Dkt. 26-29 (asserting that it was "evident during [her] time of employment that [her] skills and abilities were not compatible with the needs of [MLT's] organization"); *see also Holland v. Washington Homes, Inc.*, 487 F.3d 208, 214 (4th Cir. 2007) (recognizing that an employer's burden is only to "articulate" a legitimate, nondiscriminatory reason and that it is a burden of production). The burden thus shifts to Plaintiff to establish pretext. In other words, a plaintiff may then produce evidence that the employer's justification is "unworthy of credence" or that there is other circumstantial evidence sufficiently probative of discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 147 (2000). As the Fourth Circuit has instructed, "the core of every Title VII case remains the same, necessitating resolution of the ultimate question of discrimination." *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244, 255 (4th Cir. 2025) (internal citations and quotations omitted).

Plaintiff concedes that Defendant has documented emails discussing performance deficits but argues that such "undisclosed memoranda" are "one-sided and conclusory" and that Plaintiff disputes that her performance was deficient. Dkt. 25 at 25. But this is not the correct standard for pretext – this Court does not sit as a super-personnel board to determine whether a decision is correct, but only reviews whether it was discriminatory or retaliatory. As the Fourth Circuit has noted, "when an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for plaintiff's termination.'" *Hawkins v. PepsiCo,*

31

*Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (citing *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). Thus, it is not for the Court to determine whether Plaintiff's performance was actually sufficiently deficient to warrant termination, so long as Plaintiff's performance was the reason.

Here, there is a wealth of evidence in the record supporting that Defendant viewed Plaintiff's performance as deficient well before she engaged in any protected activity (under either Title VII or the FMLA).[55] On May 30, 2023, Plaintiff had to apologize to staff for her "attitude and demeanor." Dkt. 26-11. That same day, Zerbe prepared a memorandum to file documenting that Plaintiff made her feel uncomfortable. Dkt. 26-13. In June 2023, Tornai-Barrett advised the Executive Team that Plaintiff was overwhelmed, and Balestreri asked, "why are we hanging on to her," and Zerbe stated that "we'd certainly rather she leave on her own" and that Plaintiff's behavior "negatively impact[s] operations." Dkt. 26-14. Balestreri recommended termination. On August 10, 2023, Tornai-Barrett issued a Written Warning regarding her conduct. Dkt. 26-15. At the same time, Defendant rehired Hess, who was its prior HR Director. *Id.* That same day, Tornai-Barrett had to remind Plaintiff regarding the importance placed on responding to employee concerns, and there were a number of occasions where Plaintiff failed to meet her own standard for a timely response to employee requests. Dkt. 26-17; Dkt. 26-18; Dkt. 26-19; Dkt. 26-20; Dkt. 26-21. On June 8, 2023, Plaintiff apologized for an error and listed a number of deadlines but failed to meet the deadlines referenced. Dkt. 26-22; Dkt. 26-10 at 61:6-22. In July 2023, Defendant was unable to claim certain tax benefits because of issues with the ADP system. Dkt. 26-1 at 63:8-64:13; Dkt. 26-2 at 2 ("Typical job duties will include (but are not limited to): . . . Responsible for maintaining the ADP HRIS system . . . ."). In August 2023, Plaintiff agreed to

---

[55] Plaintiff asserts that her first FMLA-related protected activity was on September 27, 2023. Dkt. 28 at 29. Although she fails to cite anything in her argument, that assertion of fact is drawn from her interrogatory responses. Dkt. 28-1 at Rog. Resp. 6.

certain deadlines for an I-9 audit, but the report was never completed. Dkt. 26-23; Dkt. 26-10 at 66:9-14. All this occurred before Plaintiff had engaged in any protected activity, and these records are undisputed.

Although Plaintiff claims that no one ever told her of performance deficiencies, that assertion is belied by the record on summary judgment. Plaintiff received a Written Warning,[56] and Plaintiff testified that she understood that, pursuant to the Employee Handbook, Defendant need not give a final written warning before terminating employment. Dkt. 26-15; Dkt. 26-1 at 74:14-18. Moreover, Plaintiff's contention that she did not receive a further warning is belied by the record. On November 14, 2023, Plaintiff was warned by Tornai: "We/you cannot continue to operate in this manner . . . . I haven't given up on you and the last thing I want to do is raise the White Flag." Dkt. 26-24. Although Plaintiff testified that she did not understand this to be a warning, a reasonable person would have understood this as a suggestion that there were problems and understood the email from Tornai to be a warning. Plaintiff's argument that Defendant changed its rationale for Plaintiff's termination over time is also belied by the summary judgment record. The termination notice, prepared in December 2023, and provided on January 4, 2024, specifically notes, "It has become evident during your time of employment that your skills and abilities are not compatible with the needs of our organization." Dkts. 26-26, 26-29. Thus, regardless of whether Balestreri or Tornai-Barrett mentioned a need for restructuring during the meeting with Plaintiff as Plaintiff contends (Dkt. 26-1 at Rog. Resp. 5), deficiencies in Plaintiff's

---

[56] Contrary to Plaintiff's contention that she was issued "no written counseling," Dkt. 28 at 26, Plaintiff received a document entitled "Written Warning," which called out that Plaintiff appeared "overwhelmed with [her] workload" and that she had received advice about "ways to move forward in [her] work and office relationships," and specifically referenced how Plaintiff's conduct was "disruptive" and set Plaintiff "back further in [her] work and co-worker relationships," Dkt. 26-15.

performance were noted at the time of her termination and were not a *post-hoc* rationale as contended by Plaintiff. *See* Dkt. 28 at 27. Moreover, Plaintiff's contention that progressive written discipline was required before her termination is belied by Plaintiff's testimony, the Employee Handbook, and the Written Warning that Plaintiff received. *Contrast* Dkt. 28 at 27 ("MLT has no explanation why these commonsense and mandatory processes were not applied to Ms. Dancico"), *with* Dkt. 26-1 at 74:14-18; Dkt. 26-26 at 44 ("MLT reserve[s] the right to skip any steps of action at its discretion."), *and* Dkt. 26-15 ("Depending on the severity and the nature of the offense, any combination of the following actions may be taken. MLT Systems reserves the right to skip any steps at its discretion."). As discussed *supra*, Plaintiff's contention that she received performance-based bonuses is also belied by the record, which reflects that Plaintiff received a pre-negotiated payment based on her completion of a course, a project-based payment (based on hours spent on a project), and a cost-of-living adjustment. Dkt. 26-3 at 98:5-22 (negotiated raise); Dkt. 26 at 2 ¶ 3 (in accordance with negotiation); Dkt. 28 at 5 (failing to dispute the asserted fact); Dkt. 28-14 at 17:14-22 (associated with certification); Dkt. 26-6 at 62:3-9 (payment was not a bonus); Dkt. 26-10 at 18:17-20 (payment associated with project); Dkt. 28-13 at 71:20-22 (cost of living adjustment reflected in end-of-year payment).

Further undermining any suggestion of pretext is that the record establishes that the decisionmaker, Tornai, did not know about Plaintiff's anticipated FMLA leave. *See* Dkt. 26 at 12 ¶ 56 (asserting that Tornai was unaware of medical issues); Dkt. 28 at 15 (not disputing asserted fact number 56). As indicated *supra*, a decision-maker's knowledge is a key part of establishing that a decision could be retaliation. *Roberts*, 998 F.3d at 125 (recognizing that causation requires that "a plaintiff demonstrate that the decisionmaker imposing the adverse action have actual

knowledge of the protected activity").[57] Similarly, there is no indication in the record that Tornai was aware that Plaintiff had participated in a protected activity under Title VII. *Id.*[58] Moreover, any causal connection is undermined where Defendant was preparing to terminate Plaintiff before any protected activity. *See Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006) (affirming summary judgment where the "actions that led to [plaintiff's] probation and termination began before her protected activity, belying the conclusion that a reasonable factfinder might find that [defendant's] activity was motivated by [plaintiff's] complaints"). Here, members of the Executive Team were seeking Plaintiff's termination as early as June 2023, well before Plaintiff alleges that she engaged in a protected activity under either Title VII or the FMLA. Dkt. 26-14. And Balestreri recommended Plaintiff's termination weeks before the December 1, 2023 incident. Dkt. 26-25. That Tornai and Balestreri were considering termination well before the protected activity also undermines any suggestion of causation created by the temporal proximity between the actual termination and Plaintiff's asserted protected activities. *See Williams v. Fairfax Cnty.*, 2022 WL 2346615, at *12 (E.D. Va. June 29, 2022) (citing case) ("recognizing that "temporal proximity alone . . . cannot create a sufficient inference of pretext").

Plaintiff relies heavily on the Fourth Circuit's decision in *Wannamaker-Amos v. Purem Novi, Inc.*, 126 F.4th 244 (4th Cir. 2025). To begin with, Plaintiff relies on *Wannamaker-Amos*

---

[57] Any knowledge that Balestreri might have had is immaterial as the Fourth Circuit has "disavowed a test that would impute the discriminatory motivations of subordinate employees having no decision making authority to the employer, [even when those employees] have influence or even substantial influence in effecting a challenged decision." *Roberts v. Gestamp W. Va., LLC*, 45 F.4th 726, 739 (4th Cir. 2022) (internal quotation marks and ellipsis omitted).

[58] As discussed *supra*, the only activity of which it is alleged Tornai had knowledge was the December 1, 2023 meeting at which Plaintiff provided advice; Plaintiff has not established that she engaged in a protected activity at that time because there is no suggestion in the summary judgment record that Plaintiff communicated that she believed there was, and opposed, a violation of Title VII committed by Defendant.

for the proposition that it is a "fatal flaw" for an employer to rely "exclusively upon statements made by . . . the alleged discriminator." *Id.* at 256. But that principal does not apply neatly here, where it is unclear who Plaintiff contends is the "alleged discriminator." Moreover, here, unlike in *Wannamaker-Amos*, multiple members of the Executive Team had difficulties with Plaintiff, and the allegations of poor performance began well before any protected activity such that they are not "inextricably intertwined with the employee's claims of discrimination." *Id.* Moreover, unlike in *Wannamaker-Amos* where there was "no documented evidence of any supervisor criticizing Wannamaker-Amos's performance prior to Hosseini," here there is documentation – both shared and not – of the Executive Team's displeasure with Plaintiff's job performance. *Id.* at 260. Finally, the Fourth Circuit's reference to a jury's ability to "infer pretext from a decisionmaker's effort to build a file of issues never discussed with the plaintiff" is beneficially put in context by the next sentence which refers to "[d]ocumentation created at the time of termination which relies on past events for which there is no contemporaneous documentation." *Id.* at 258 n.7. Here, there are contemporaneous documents with respect to most, if not all of the performance issues documented, and Plaintiff herself was aware that she had apologized to staff, received a Written Warning, had missed several deadlines, was not responding to employees in a timely fashion (Dkt. 26-17), and that they could not "continue to operate in this manner" (Dkt. 26-24). This is thus a far cry from the circumstances in *Wannamaker-Amos*. *See Hood-Wilson v. Bd. of Trs. of Cmty. College of Balt. Cnty.*, 162 F.4th 101, 110 (4th Cir. 2025) (distinguishing *Wannamaker-Amos* where an employee had received a written warning).

In short, Plaintiff has failed to present evidence from which a reasonable juror could infer that Plaintiff's asserted protected activities were the real basis for her termination. At this stage of litigation, Plaintiff has pointed to no evidence – outside of temporal proximity alone – which

supports an inference of retaliation or which establishes a genuine issue of material fact with respect to Plaintiff's termination. Accordingly, the Motion will be granted with respect to Counts 1 and 3.

## B. FMLA Interference

Defendant next seeks summary judgment on Plaintiff's FMLA interference claim in Count 4. As the Fourth Circuit has recognized, to "make out an FMLA interference claim, an employee must demonstrate (1) that he is entitled to an FMLA benefit; (2) that his employer interfered with the provision of that benefit; and (3) that the interference caused him harm." *Adkins v. CSX Transp., Inc.*, 70 F.4th 785, 796 (4th Cir. 2023). The Fourth Circuit has clarified, however, that an employer may "avoid liability if it shows it would have taken the contested adverse employment action regardless of the employee's FMLA Leave." *Roberts v. Gestamp W. Va., LLC*, 45 F.4th 726, 732-33 (4th Cir. 2022); *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 547 (4th Cir. 2006) ("We join our sister circuits in concluding that the FMLA does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave."). For the same reasons discussed above, Defendant has adduced significant evidence that it would have reached the same decision anyways, particularly given that the ultimate decisionmaker (Tornai) was unaware of any medical issues, need for FMLA leave, or request for FMLA leave. *See* Dkt. 26 at 12 ¶ 56 (asserting that Tornai was unaware of medical issues); Dkt. 28 at 15 (not disputing asserted fact number 56).[59]

---

[59] Outside of a single paragraph early in Plaintiff's Opposition (Dkt. 28 at 4), Plaintiff does not separately discuss the FMLA interference claim. Thus, the parties (and the Court) treat this claim as largely rising and falling based on the pretext analysis with respect to the retaliation claims.

The Court does note that Plaintiff asserts that there is a "genuine issue of material fact regarding whether MLT replaced Ms. Dancico while she was on leave which qualified under the

## V. CONCLUSION

In sum, the undisputed factual record at summary judgment demonstrates that there are no genuine disputes of fact precluding summary judgment in favor of Defendant. Plaintiff has failed to establish facts supporting her *prima facie* case of retaliation under Title VII and has failed to demonstrate pretext on both her Title VII and FMLA retaliation claims. Furthermore, based on the same facts that supported the lack of pretext, Defendant has demonstrated that it would have reached the same decision to terminate Plaintiff regardless of her exercise of her FMLA rights.

Accordingly, it is hereby ORDERED that Defendant's Motion for Summary Judgment (Dkt. 25) is GRANTED; and it is

FURTHER ORDERED that the Clerk of Court is DIRECTED to enter Rule 58 judgment in favor of Defendant and against Plaintiff on Counts 1, 3, and 4 of the Complaint;[60] and it is

FURTHER ORDERED that the Clerk of Court is DIRECTED to place this matter among the ended causes.

It is SO ORDERED.

Alexandria, Virginia
February 11, 2026

/s/
Rossie D. Alston, Jr.
United States District Judge

---

FMLA." Dkt. 28 at 4. This is somewhat confusing, because the summary judgment record establish that Plaintiff was replaced on the same day that she *requested* leave, not *during* leave. In any event, there can be no genuine dispute of material fact because the factual record demonstrates that the Executive Team had been attempting to terminate Plaintiff since June 2023 (well before any suggestion of FMLA leave), had documented a history of performance issues, and Tornai terminated Plaintiff without knowing of the need for any FMLA leave. Thus, the record at summary judgment establishes, consistent with Fourth Circuit precedent, that Defendant would have terminated Plaintiff regardless of any request for FMLA leave. *See Roberts*, 45 F.4th 732-33.

[60] As a reminder, Count 2 was previously dismissed without prejudice and Plaintiff chose not to amend that count.